487 A.2d 294

Eric **ANDERSON, Sr.**

v.

**STATE of Maryland.**

**No. 77, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Feb. 6, 1985.

438

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Stephanie J. Lane, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and Charles Chiapparelli, Asst. State's Atty., Baltimore, for Baltimore City on brief), for appellee.

Submitted before MOYLAN, WILNER and BLOOM, JJ.

MOYLAN, Judge.

The key issue on this appeal is whether the enactment of the Child Abuse Law, Md.Code Ann. Article 27, § 35A (1957, 1982 Repl.Vol.), preempted a particular corner of the field of common law assault and battery and thereby repealed it. The significance to the appellant, Eric Anderson, Sr., is apparent. He was charged in a two-count indictment with 1) statutory child abuse and 2) common law assault and battery upon his eighteen-month-old son, Eric Anderson, Jr. A Baltimore City jury, presided over by Judge Mary Arabian, somehow found him not guilty of child abuse but guilty of assault and battery. Upon this appeal, he raises three contentions:

1) That the common law crime of assault and battery, in the factual context of this case, has been repealed by the enactment of the Child Abuse Statute;

2) That the trial judge erroneously permitted the introduction of the appellant's prior conviction for carrying a handgun; and

3) That the trial judge too austerely inhibited the offering of character evidence by the defense.

 One of the varieties of criminal conduct embraced by the word "assault" or phrase "assault and battery"[1] is a consummated battery. A battery is the unlawful application of force to the person of another. As the battery includes an assault, we will, as a linguistic convention, use the fuller expression "assault and battery." Assault and battery is a common law misdemeanor. Many common law jurisdictions, including Maryland, have supplemented the common law by statutes spelling out various aggravated assaults and batteries, frequently denominating them as felonies and frequently providing for enhanced punishment.[2] For example, Article 27, § 12, established the felonies of assault with intent to rob, assault with intent to murder, and assault with intent to commit either rape or certain sexual offenses; Article 27, § 386, established the felony of assault with intent to maim or disfigure. These aggravated assaults embrace, but do not require, actual batteries. Other jurisdictions, again by way of example, single out for aggravated, statutory treatment (generally at the felony level) such aggravating circumstances as "assault with a dangerous or deadly weapon" and "assault which produces grievous bodily harm." W. LaFave & A. Scott, *Handbook on Criminal Law* 607 (1972).

---

**1.** The single word "assault" and the whole expression "assault and battery" are frequently used as loosely synonymous terms. Just as "assault" can mean an actual battery, as used above, it also embraces two other varieties of criminal conduct, not here pertinent: 1) an attempted battery, and 2) an intentional placing of another in apprehension of receiving an immediate battery. R. Perkins, *Criminal Law* 114–130 (2d ed. 1969); W. LaFave & A. Scott, *Handbook on Criminal Law* 602–614 (1972).

**2.** In Maryland, the significant maximum penalties provided for the aggravated assaults and batteries are theoretically, and anomalously, not actually enhancements at all, because a conviction for common law assault and battery still carries the open-ended common law punishment of any sentence not cruel and unusual. *Walker v. State,* 53 Md.App. 171, 192–199, 452 A.2d 1234 (1982); *and see Apple v. State,* 190 Md. 661, 668, 59 A.2d 509 (1948); *Heath v. State,* 198 Md. 455, 467, 85 A.2d 43 (1951); *Gleaton v. State,* 235 Md. 271, 277–278, 201 A.2d 353 (1964); *Roberts v. Warden,* 242 Md. 459, 460–461, 219 A.2d 254 (1966); *Simms v. State,* 288 Md. 712, 726–727, 421 A.2d 957 (1980).

Maryland's Child Abuse Statute is broader, in one respect, than an aggravated assault statute, but nonetheless partakes of such a statute in some of its essential characteristics. It is broader in that it does not require "a physical assault upon the child" or that "any physical force [be] applied by the accused individual." *State v. Fabritz*, 276 Md. 416, 424, 348 A.2d 275 (1975), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976).[3] The Child Abuse Statute is, on the other hand, more restrictive than common law assault and battery in that it focuses narrowly upon a discrete class of potential violators and a discrete class of victims. The statute's prohibition is directed at:

1) Any parent; or

2) other person who has the permanent or temporary care or custody or responsibility for the supervision of a child.[4]

In this opinion, we will use the phrase *"in loco parentis"* to describe all members of the targeted class. The statute's

---

**3.** In speaking for the Court of Appeals, Chief Judge Murphy there observed:

"In making it an offense for a person having custody of a minor child to 'cause' the child to suffer a 'physical injury,' *the Legislature did not require that the injury result from a physical assault upon the child or from any physical force initially applied by the accused individual;* it provided instead, in a more encompassing manner, that the offense was committed if physical injury to the child resulted either from a course of conduct constituting 'cruel or inhumane treatment' or by 'malicious act or acts.'" (Emphasis supplied).

**4.** Section 1, ch. 296, Laws of 1984, effective October 1, 1984, adopted the above language. Prior to the amendment, the earlier version of Article 27, § 35A defined the target class as "Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child...." The only effect of the amendment in this regard was to eliminate any linguistic, as well as legal, distinction between a biological parent and an adoptive parent. Although the earlier version was in effect at the time of the allegedly criminal conduct here under review, the change in wording has no bearing on this appeal.

protection, moreover, is afforded only to "a child," who is defined as "any individual under the age of 18 years." [5]

Although, as was made clear by *State v. Fabritz, supra,* the Maryland Child Abuse Statute, since its amendment in 1973,[6] is broad enough to embrace some conduct which does not involve a literal assault and battery, it is nonetheless clear that the statute is aimed primarily at conduct which does involve an assault and battery. The nationwide reform movement in this area, which began in the late 1950's,[7] was generally characterized as a legislative response to the so-called "battered child syndrome." [8] Indeed, Maryland's initial response to the problem in 1963 was the enactment of an aggravated assault statute, at the felony level, entitled "Assault on Child." [9]

What emerges is that the Child Abuse Statute, although applying only to victims under 18 and to defendants who stand *in loco parentis,* covers a part of the territory traditionally covered by common law assault and battery. The issue for decision is whether, within the area where the two proscriptions overlap, the statutory crime has displaced the common law crime or simply supplemented it. The resolution of the issue requires us to look to the common

---

**5.** With respect to the victim class, the only change worked by the 1984 amendment was stylistic. The earlier version of the law spelled out in its operational section the potential victim as "a minor child under the age of eighteen years." The new operational clause refers simply to the victim as "a child" but earlier, in its definitional section, defines "child" as "any individual under the age of 18 years."

**6.** Laws of 1973, ch. 835.

**7.** The scholarly opinion of Judge Levine for the Court of Appeals in *Bowers v. State,* 283 Md. 115, 117–119, 389 A.2d 341 (1978), traces concisely the progress of this reform movement. *See also* Note, *Maryland Laws on Child Abuse—History, Analysis and Reform,* 6 U.Balt.L.Rev. 113 (1976).

**8.** The popular use of the phrase, if not its initial employment, came from the groundbreaking clinical study prepared by a team of pediatricians in 1962. *See* Kempe, Silverman, Steele, Droegenmueller & Silver, *The Battered Child Syndrome,* 181 J.Am.Med.A. 17 (1962).

**9.** Ch. 743 of the Laws of 1963, initially codified as Article 27, § 11A.

law crime of assault and battery itself and, more particularly, to the defenses, privileges, or justifications that come into play when the special relationship between child and one *in loco parentis* is involved.

As a defense, by way of justification, to what would otherwise be an assault and battery, an individual *in loco parentis* may sometimes, but not always, establish that the force used upon the child was privileged as necessary and proper to the exercise of domestic authority. The text writers treat this subject of privileged force under the label "Domestic Authority" as a subdivision within the broader topic "Justification and Excuse." It still covers such relationships as parent-child and schoolteacher-pupil, although other and earlier exercises of domestic authority involving relationships such as master-apprentice and husband-wife have been relegated to the dustbin of history. W. LaFave & A. Scott, *supra*, treats the subject, at 389–390:

> "The parent of a minor child is justified in using a reasonable amount of force upon the child for the purpose of safeguarding or promoting the child's welfare. Thus the parent may punish the child for wrongdoing and not be guilty of a battery or of a violation of a statute punishing cruelty to children if the punishment is inflicted for this beneficent purpose, and if the punishment thus inflicted is not excessive in view of all the circumstances (including the child's age, sex, health, his misconduct on the present occasion and in the past, the kind of punishment inflicted, and the degree of harm done to the child thereby). The parent's right to use reasonable force has been extended to those, not parents, who are 'in loco parentis'—such as a stepfather or even a paramour living with the child's mother without benefit of matrimony, a guardian, or the director of an orphanage."

R. Perkins, *Criminal Law* (2d ed. 1969), addresses the subject, at 987:

> "Firmly recognized in the law, however, is the right of the parent to discipline his minor child by means of moderate chastisement. The right to correct an adopted

child is the same as the right of a natural parent in this regard, and this authority has been extended even to one who has taken a child into his home to be brought up as a member of the family without formal adoption. Similarly a guardian may lawfully administer moderate chastisement for the correction of his ward."

The scholarly opinion of Judge Levine in *Bowers v. State,* 283 Md. 115, 389 A.2d 341 (1978), discussed this exercise of privileged force in promoting child discipline, at 283 Md. 126, 389 A.2d 341:

"Long before the advent of contemporary child abuse legislation, it was a well-recognized precept of Anglo-American jurisprudence that the parent of a minor child or one standing in *loco parentis* was justified in using a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare."

The common law notion of privileged force as a defense to what would otherwise be assault and battery has two clear limitations. The first, so taken for granted that it tends to be neglected by the case law and legal literature, is that the force truly be used in the exercise of domestic authority by way of punishing or disciplining the child—for the betterment of the child or promotion of the child's welfare—and not be a gratuitous attack.[10] The second

---

**10.** The justification of privileged force available to one *in loco parentis* to a minor child is only available within the context of punishing or chastising the child; to wit, in the actual exercise of "domestic authority." The treatment by W. LaFave & A. Scott, *supra,* at 389–390, speaks of the justification, within appropriately moderate bounds, as being present when the force was applied "for the purpose of *safeguarding or promoting the child's welfare.*" It goes on to state that "the parent may *punish* the child for wrongdoing and not be guilty" and to establish the context for the privilege as one where "the *punishment* is inflicted for this beneficent purpose." Professor Perkins' treatment, at 987, speaks of "the right of the parent to *discipline* his minor child by means of moderate *chastisement* " and makes clear that the existence of the privilege is only within the factual context of exercising "[t]he right *to correct* " and "lawfully [to] administer moderate *chastisement* for the *correction* of his ward." Judge Levine in *Bowers v. State, supra,* at 283 Md. 126, 389 A.2d 341, points out that the

limitation, and that which has commanded almost all of the law's attention, is that the amount of force used be moderate and reasonable. Almost all of the discussions assume, in passing, the satisfaction of the first condition and lavish total attention upon the second. In discussing the requirement that punishment be moderate, R. Perkins, *supra*, observes, at 988:

"The authority of a parent or teacher to punish a child will not justify immoderate punishment, and any excess of this nature will constitute an assault and battery; but the test of unreasonableness in this regard should be found, not in some slight error of judgment as to the force to be used, but in the substitution of a malicious

---

justification of using reasonable force is available "for the purpose of *safeguarding or promoting the child's welfare.*" (Emphasis supplied).

Thus, the very question of whether the force employed is sufficiently moderate to be privileged only has pertinence when the other necessary precondition to the privilege is also present—that the force, moderate or immoderate, is being applied for purposes of chastising or punishing the child. Although instances of such depraved behavior will be rare, the hypothetical possibility nonetheless exists of one *in loco parentis* assaulting and beating a minor child outside any suggested context of punishment or chastisement. In the case of such gratuitous and not even arguably justifiable attack, the assailant is guilty of assault and battery whether the force employed is moderate or immoderate. In this context, the parent or custodian stands as a legal stranger in relation to the child and not within any privileged status.

In such a context, the enactment of the Child Abuse Statute has not even arguably displaced the common law crime of assault and battery. It represents, rather, an aggravated, statutory version of the common law crime. If the totally gratuitous assault and battery does not inflict sufficient physical injury to qualify under the statute, the assailant is still guilty of the common law misdemeanor of assault and battery. If, on the other hand, the injury inflicted is sufficient to satisfy the statute, the crime may be escalated to the felony level with its maximum penalty of fifteen years.

It will thus be seen that under both the Child Abuse Statute and common law assault and battery, immoderate as opposed to moderate physical force is the *sine qua non* of guilt within the context of a parent punishing or chastising a child. Within the very different context of a gratuitous assault and battery perpetrated without an even colorable claim of domestic authority, immoderate force, as opposed to moderate force, serves to aggravate the crime and to enhance the level of guilt.

desire to inflict pain in place of a genuine effort to correct the child by proper means."

Once again, the definitive treatment in Maryland of this limitation on the parental privilege to instances where the discipline or punishment remains within the bounds of moderation, is found in *Bowers v. State, supra,* at 283 Md. 126, 389 A.2d 341:

> "So long as the chastisement was moderate and reasonable, in light of the age, condition and disposition of the child, and other surrounding circumstances, the parent or custodian would not incur criminal liability for assault and battery or a similar offense."

Where, on the other hand, the chastisement becomes immoderate, it defeats the parental privilege and is treated as an ordinary assault and battery, as if perpetrated upon a stranger:

> "On the other hand, where corporal punishment was inflicted with 'a malicious desire to cause pain' or where it amounted to 'cruel and outrageous' treatment of the child, the chastisement was deemed unreasonable, thus defeating the parental privilege and subjecting the parent to penal sanctions in those circumstances where criminal liability would have existed absent the parent-child relationship."

*Id.* There simply is no privilege, even within the context of administering ostensible child discipline, for excessive, cruel, or immoderate conduct:

> "Put another way, a parent was not permitted under the common law to resort to punishment which would exceed 'that properly required for disciplinary purposes' or which would extend beyond the bounds of moderation. 'Excessive or cruel' conduct was universally prohibited."

*Id. See also Fabian v. State,* 235 Md. 306, 318–219, 201 A.2d 511, *cert. denied,* 379 U.S. 869, 85 S.Ct. 135, 13 L.Ed.2d 72 (1964); *Moore v. State,* 15 Md.App. 396, 404–405, 291 A.2d 73, *cert. denied,* 266 Md. 740 (1972).

The use of immoderate force is the thing that defeats the parental privilege, even where otherwise applicable. The use of immoderate force is also a necessary element under the Child Abuse Statute. The key words of the statute, rendering one *in loco parentis* guilty of the felony, are that the defendant shall have "cause[d] abuse to the child." The statute, in turn, defines "abuse" in subsection (a)(2) as:

"(i) The sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child under circumstances that indicate that the child's health or welfare is harmed or threatened thereby; or

(ii) Sexual abuse of a child, whether physical injuries are sustained or not." [11]

The question that arises is that of the correlation between the degree of immoderation necessary to destroy the common law privilege and the degree of immoderation necessary to satisfy the Child Abuse Statute. In the course of finding the Child Abuse Statute not unconstitutionally void for vagueness, *Bowers v. State, supra,* at 283 Md. 127, 389 A.2d 341, found there to be a perfect correlation:

"By electing to restrict the criminal liability of parents under the statute only to those cases where the parent or custodian causes his child or ward to sustain physical injury as a result of cruel or inhumane treatment or as a result of other acts of malice, the Legislature apparently intended the definition of abuse to correspond to that type of conduct which would have sufficed to destroy the privilege to discipline at common law.

Thus, the terminology employed in Article 27, § 35A(b)(7)(A) appears to be nothing but a codification of the common law principles concerning the limits of permissible parental chastisement."

---

11. "Sexual abuse," not here pertinent, is also further defined by the statute.

■ The net result is that within the context of the physical punishment of a minor by one standing *in loco parentis*, every use of excessive or immoderate force that would have defeated the common law privilege and thereby rendered the assailant guilty of common law assault and battery would, *ipso facto*, render one guilty under the Child Abuse Statute.

Within the context, therefore, of one who is ostensibly acting *in loco parentis* exercising ostensible domestic authority at an ostensibly immoderate level over one who is ostensibly a child, there is obviously a significant, if not total, overlap between the Child Abuse Statute and common law assault and battery. Even when dealing with a relationship between one *in loco parentis* and a child, however, this area of overlap represents one limited quadrant of a significantly larger field:

| | Exercise of Domestic Authority | Gratuitous Attack |
|---|---|---|
| IMMODERATE FORCE | 12<br>CHILD ABUSE<br>and<br>ASSAULT AND BATTERY | CHILD ABUSE<br>as an aggravated form<br><br>of |
| MODERATE FORCE | NO CRIME<br>not covered by the statute;<br>privileged at common law | ASSAULT AND BATTERY |

■ The issue before us is whether the Child Abuse Statute has preempted the field and, therefore, repealed common law assault and battery within a factual situation where one *in loco parentis* is guilty of using immoderate

---

12. It is only within this limited quadrant, where both the exercise of domestic authority and the use of immoderate force overlap, that the question of the repeal of the common law by the enactment of the statute even comes into play. The other three quadrants are not remotely troubled by the preemption issue.

force in the course of exercising domestic authority over a child. We hold that it has not.

A preliminary word is in order about the spirit with which the law approaches the possible erosion of the common law. That spirit can best be understood when we remember that the common law of England is constitutionally guaranteed to the citizens of Maryland—that in enacting our very charter of liberty we provided "That the Inhabitants of Maryland are entitled to the Common Law of England...." [13] The protection of our citizens against assault and battery is part of that original entitlement, embedded in our very charter of statehood, and we do not lightly—by mere implication—dissolve so venerable a guarantee.

This attitude was early expressed by *Hooper v. Baltimore*, 12 Md. 464, 475 (1859):

"In *Dwarris on Statutes*, 695, it is said, 'As a rule of exposition, statutes are to be construed in reference to the *principles* of the common law. For it is not to be presumed that the Legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the Act did *not* intend to make any alteration *other* than what is *specified*, and besides *what has been plainly pronounced.*' " (Emphasis in original). *See also Keech v. Baltimore & Washington R. Co.*, 17 Md. 32, 45 (1861); *Harrison v. State*, 22 Md. 468, 488 (1864); *Greenwood v. Greenwood*, 28 Md. 369, 386 (1868); *Heiskell v. Baltimore*, 65 Md. 125, 151, 4 A. 116 (1886).

In *Lutz v. State*, 167 Md. 12, 172 A. 354 (1934), the appellant claimed that the newly enacted (1920) statute proscribing "Prostitution, Lewdness and Assignation" superseded and thereby repealed the common law offenses of maintaining a bawdy house and maintaining a disorderly house. In holding otherwise, the Court of Appeals said, at 167 Md. 15, 172 A. 354:

---

**13.** Article 5, Maryland Declaration of Rights.

"In 25 R.C.L. 1054, it is said that: 'It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory.'

Where, however, a statute and the common law are in conflict, the common law yields to the statute to the extent of the inconsistency (*Sutherland on Stat. Const.* sec. 294; 12 C.J. 186), and a statute which deals with an entire subject matter is generally construed as abrogating the common law as to that subject."

*See also Gleaton v. State,* 235 Md. 271, 277, 201 A.2d 353 (1964); *State v. Gibson,* 4 Md.App. 236, 247, 242 A.2d 575 (1968) *aff'd* 254 Md. 399, 254 A.2d 691 (1969); *Watkins and Kingwood v. State,* 42 Md.App. 349, 400 A.2d 464 (1979); *Gray v. State,* 43 Md.App. 238, 240–243, 403 A.2d 853 (1979).

The Maryland attitude is consistent with that of our sister legatees of the common law tradition. The general rule in this regard is discussed in 3 Sutherland, *Statutes and Statutory Construction* 41 (Sands ed. 1974):

"The rule has been declared by the United States Supreme Court, as follows: 'No statute is to be construed as altering the common law, further than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.'"

Although it was only a decidedly lesser contention in a package of seemingly far more important issues, this very question almost demanded our attention in *Worthen v.*

*State,* 42 Md.App. 20, 36–37, 399 A.2d 272 (1979). The situation with respect to charges and verdicts was identical to that now before us. The defendant there had been charged under both the Child Abuse Statute and for common law assault and battery. Each charge related to the same injury inflicted by the defendant upon his stepchild. The jury convicted him of assault and battery but exonerated him of child abuse. One of the issues raised was that now before us:

> "He adds as an additional reason for us to reverse that: 'The child abuse statute, Article 27, Section 35 A preempts and supersedes the common law crime of assault and battery upon a child by a parent or person acting *in loco parentis* and precludes Appellant's conviction and criminal liability for the offense under the common law.' "

42 Md.App. at 36, 399 A.2d 272.

We deliberately did not address the issue because it had not been raised or decided below. Md.Rule 1085. In strong dicta, however, Judge Lowe gave unequivocal intimations as to the "apparent facial absurdity" of the question. Although, to be sure, only dicta, our feeling as to legislative intent was clear:

> "For purposes of this case, we can with short shrift dispose of appellant's additional contention. It relies primarily on our borrowed observation in *Dill v. State,* 24 Md.App. 695, 703 [332 A.2d 690] (1975), *quoting State v. Salafia,* 29 Conn.Supp. 305 [284 A.2d 576]:
>
>> ' "When there is disparity in the punishment applicable to the offense as a common-law crime and as a statutory violation, it would be a palpable absurdity to hold that the common law had not been supplanted by the statute." '
>
> To carry appellant's reasoning to its logical conclusion by judicially imputing such legislative intent in the instant case, would also be a 'palpable absurdity.' If assault is supplanted by applying this test to the child abuse stat-

ute, so would the other related offenses, including all sex crimes and homicide crimes, when committed by one *in loco parentis* against a child victim. If one believes the Legislature's answer to its obvious concern over crimes against children was to limit the punishments therefore— now that would be absurd!"
42 Md.App. at 36–37, 399 A.2d 272.

A closely analogous preemption question was before us in *Gray v. State, supra.* There the defendant had been convicted of the common law misdemeanor of criminal attempt, to wit: an attempted second-degree rape. The thrust of his argument was that the General Assembly had preempted the "Sexual Offenses" field by Chapter 573 of the Acts of 1976, now codified as Article 27, §§ 461–465. In holding that the new statutes did not preempt the field by encompassing all inchoate sexual conduct, we observed that the Legislature manifested no clear intent to repeal or replace the undergirding common law crime:

"We note initially that the Legislature gave no indication that it intended the new subtitle to repeal or replace the common law misdemeanor of criminal attempt with respect to the substantive offenses it was then enacting."
43 Md.App. at 240, 403 A.2d 853.

In enacting, and subsequently amending, the Child Abuse Statute, the Legislature has never, even obliquely, intimated any intention of repealing or replacing common law assault and battery.

Despite an overlap that is almost total, save only in the most exotic of hypotheticals, *Gray v. State*, 43 Md.App. at 244, n. 7, 403 A.2d 853, the statutory felony of assault with intent to rape has been held by us not to have preempted the field and not, therefore, to have displaced common law attempted rape. *Christensen v. State*, 33 Md.App. 635, 637–641, 365 A.2d 562 (1976). In commenting upon the continuing viability of both of these closely related inchoate crimes, we observed in *Gray v. State*, at 43 Md.App. 241, 403 A.2d 853:

"For inchoate, not fully-consummated, crime, society has long had available in its arsenal both the statutory offense of 'assault with intent to ...' and the common law offense of criminal attempt. Although these two offenses have a significant overlap, they are nonetheless distinct and each addresses certain pockets of inchoate criminal activity not covered by the other."

More recently, in *DiBartolomeo v. State,* 61 Md.App. 302, 486 A.2d 256 (1985), Judge Wilner analyzed the extensive overlapping of a Sexual Offense in the First or Second Degree (Art. 27, §§ 465 and 465A), Sodomy (§ 553), and Perverted Practices (§ 554). He noted that self-evidently "the three offenses overlap." As in the situation at bar, the total coverages of the different statutes are not identical but there are within those larger coverages, identical pockets of more particularized activity that are made criminal by more than one statute. As the Court there observed:

"While they are not identical and do not purport to proscribe precisely the same range of conduct, it is the case that certain types of sexual activity may constitute both sodomy and a statutory perverted practice, and, depending upon the circumstances of its commission, may also constitute either a first or second degree sexual offense."

Notwithstanding the multiple proscription of the same criminal act by more than one criminal provision, we found that "the non-repealer of [the preexisting crimes] provided evidence that the Legislature did not intend by its [newer statutory] enactment to preempt the entire field of criminal ... activity." It is equally clear that the Legislature, in enacting the Child Abuse Statute, took no step to repeal the common law misdemeanor of assault and battery, even in the limited context of an assault perpetrated by one *in loco parentis* upon a child for purposes of chastisement. If the Legislature did not repeal the common law crime, it is not repealed.

The only succor the appellant can find is in *State v. Gibson,* 4 Md.App. 236, 242 A.2d 575 (1968), *aff'd,* 254 Md.

399, 254 A.2d 691 (1969), and there, only by analogy. In that case, we analyzed the impact of the enactment of Article 27, § 388, establishing the misdemeanor of "manslaughter by automobile ... or other vehicle," upon the common law felonies of murder and manslaughter. Since the statute did not cover all unlawful killings where the instrumentality of death had been a vehicle, but only those where the vehicle had been operated "in a grossly negligent manner," any vehicular homicide that would have qualified as common law murder was untouched by the statute. *Connor v. State*, 225 Md. 543, 171 A.2d 699, *cert. denied*, 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961).

Even within the narrower confines of manslaughter, a further distinction, based only on *mens rea*, was made. Common law voluntary manslaughter—an intentional killing mitigated down to the manslaughter level of blameworthiness by virtue of provocation or one of the imperfect defenses—was untouched by the statute. The only area impacted by the statute was common law involuntary manslaughter where the instrumentality of death had been a motor vehicle. Within that limited area, the criminally proscribed *conduct* was the same.

Dealing in the context of that case with a limited corner of a larger manslaughter field—limited by both the instrumentality of death and by the *mens rea* (gross negligence) of the killer—we concluded that even such a factually limited segment could represent "an entire subject matter" for purposes of statutory preemption and repeal of the common law. Chief Judge Murphy's holding for this Court, at 4 Md.App. 247, 242 A.2d 575, was:

> "We conclude, therefore, that in enacting Section 388, the Legislature intended to deal with an entire subject matter—unintended homicides resulting from the operation of a motor vehicle—and that the common law crime of involuntary manslaughter, when based on homicides so

occurring, is in conflict with the statute and must yield to it to the extent of the inconsistency." [14]

We find the analogy between this case and *State v. Gibson, supra,* to be inapt for two distinct reasons. The statutory enactment of the crime of Manslaughter by Automobile was intended to provide a more lenient treatment for that broad and easily identifiable category of cases where death had resulted from the negligent operation of a motor vehicle. In moving downward from common law manslaughter, the plateau of culpability was lowered from the felony level to the misdemeanor level. In contrast to the ten-year maximum sentence available for the common law felony, the statutory "cap" for a violation of the new misdemeanor was three years. (In *Dill v. State, supra,* the same downward direction from common law crime to statutory crime was involved. We found it unreasonable to permit an open-ended penalty under the common law for conduct which under the statute carried a "maximum penalty of a fine of $50.00."). In what was nothing more than a particularized instance of a broader phenomenon invoking what is known as the "Rule of Lenity," Chief Judge Mur-

---

**14.** The situation at bar and in *State v. Gibson, supra,* is unlike that dealt with by *Dill v. State,* 24 Md.App. 695, 332 A.2d 690 (1975). In that case, the entire field covered by the common law crime of Indecent Exposure was held by us to have been supplanted by the 1902 enactment of what became Article 27, § 122, proscribing precisely the same conduct as one mode of "disturbing the peace." In such a clear-cut case, where "there is no distinction between the substantive offense of indecent exposure under the common law and under the statute," Chief Judge Orth, speaking for the Court, had no difficulty in concluding that the common law had "been supplanted by the statute":

"It would be palpably absurd, completely unreasonable, and inconsistent with common sense to hold that the common law had not been supplanted by the statute. To conclude otherwise would be to attribute an intention to the legislature to permit the prosecution of offenders either for the common law crime, with its penalty of imprisonment limited only by the reasonable discretion of the sentencing judge and the constitutional guarantee against cruel and unusual punishments, or for the statutory offense, with its maximum penalty of a fine of $50, even though the proof necessary to justify a conviction in either case would be precisely the same."
24 Md.App. at 705, 332 A.2d 690.

phy concluded that the legislative intent was to lower the ceiling with respect to potential punishment:

> "We believe that the Legislature in enacting Section 388 to punish persons who cause the death of another 'as the result of the driving, operation or control of an automobile ... in a grossly negligent manner,' intended to treat all unintended homicides thereby resulting in the same way...."

4 Md.App. at 246, 403 A.2d 853. When the direction from the common law crime to the statutory crime is downward in terms of available punishment, what emerges is a clearly identifiable legislative intent to mitigate the harshness of the common law and to deal with the proscribed conduct in a more lenient fashion. This was the fulcrum of our holding in *State v. Gibson*, at 4 Md.App. 246, 403 A.2d 853:

> "To otherwise conclude would be to attribute an intention to the Legislature to permit the prosecution of offenders either for the felony of common law manslaughter, with its ten-year penalty, or for the statutory misdemeanor of manslaughter by automobile, with its three-year penalty, even though, where the prosecution is based upon gross negligence, the proof necessary to justify a conviction in either case would be precisely the same ...."

In the case at bar, by way of diametric contrast, the direction from the common law to the statutory crime is unmistakably upward. When the Legislature singles out conduct which is directly, or in significant measure, an aggravated form of already proscribed behavior, the direction is upward in terms of harshness.

■ Notwithstanding the strange anomaly created by the open-ended nature of the common law punishment for simple assault, the various statutory assaults, with significant maximum penalties provided, are clearly intended to deal more harshly with the aggravated form of the crime. The placement of the statutory crime on the felony plateau

signifies this elevation of guilt and punishment. When the obvious legislative intent is to deal more harshly with aggravated forms of already criminal behavior, there is no inherent incompatibility between the greater and lesser crimes; there is no preempting of the field and no repeal of the lesser, common law crime.

If the law were otherwise, it would be an absurdity. It would mean that every legislative creation of a greater, inclusive offense would, *ipso facto*, repeal (by preemption) every lesser, included offense whenever the conduct clearly indicates guilt on the greater charge. That, of course, is not the law. Where the direction of the law is by way of ameliorating its former harshness, we do not permit arbitrary fact finding or arbitrary charging decisions to avoid that intended amelioration. Where, however, the direction of the law is by way of making available harsher treatment, we do permit possibly arbitrary fact finding and possibly arbitrary charging decisions to avoid the available, but not compelled, harsher treatment. The prohibition against arbitrary charging decisions and arbitrary verdicts is one-directional. We provide a ceiling, but not a floor. The option, upon the evidence in the case, of a guilty verdict for the felony of Child Abuse does not preclude a verdict, perhaps arbitrary, for the misdemeanor of common law assault and battery. The very option to choose the lesser verdict, perhaps by way of illogical or arbitrary compromise, proclaims the continuing viability and nonrepealer of that lesser crime, even when precisely the same conduct would permit a finding of guilt of some other, greater crime.

This ability to move up or down the harshness ladder has a utility all of its own.

At one end of the tactical spectrum, the State might choose to charge only common law assault and battery for the deliberate purpose of avoiding the 15-year "cap" provid-

ed for the felony of Child Abuse. *Simms v. State*, 288 Md. 712, 725–726, 421 A.2d 957 (1980); *Turner v. State*, 45 Md.App. 168, 172–173, 411 A.2d 1094 (1980); *Manigault v. State*, 61 Md.App. 271, 486 A.2d 240 (1985).

At the other end of the tactical spectrum, a merciful and sympathetic fact finder might prefer to place the guilt of a borderline child abuser at the misdemeanor level rather than at the felony level; might wish to avoid placing the stigma of the label "child abuser" upon the defendant; or might choose to signal the sentencing judge that a lesser penalty is in order (although anomalously, the signal would be nonbinding). All of these purposes would be achieved by declining to find the defendant guilty under the Child Abuse Statute and, instead, finding the defendant, upon the same facts, guilty of common law assault and battery.

There is yet a second factor which distinguishes the case at bar from *State v. Gibson, supra.* There, the line that separates automobile manslaughter from all other forms of involuntary manslaughter stands out with unmistakable clarity. Here, by way of contrast, the line between felonious child abuse and non-identical forms of assault and battery is potentially blurred in a number of places. Where, on the evidence of the case, the line that separates child abuse from assault and battery is blurred, the utility of a crime such as assault and battery is readily apparent.

Sometimes a long course of abusive behavior over an imprecise period of time will hover perilously close to a victim's eighteenth birthday. In such a case, there may be problems of proof that are insurmountable under the Child Abuse Statute but which present no problem on a charge of assault and battery.

There are frequent situations where defendants are live-in boyfriends or boyfriends who simply drop in with greater or lesser frequency. Here, the assailant may or may not be acting *in loco parentis.* In such a case, there may be

problems of proof that are insurmountable under the Child Abuse Statute but which present no problem on a charge of assault and battery.

There will sometimes be a real question as to whether assaultive behavior is in the exercise of domestic authority or is a gratuitous and unprovoked attack. Where the level of force is immoderate, it is never privileged and the difference may be only academic. Where the force is at the moderate level, however, but is arguably not employed in the exercise of domestic authority, then the availability of assault and battery is the only alternative to a finding of not guilty.

There are so many potential utilities to the common law crime of assault and battery that we cannot conceive of any remote legislative purpose or intent to repeal it, even where its proscribed behavior may overlap behavior similarly proscribed by the Child Abuse Statute.

The conviction for assault and battery in this case stands undisturbed.

The appellant's remaining two contentions will not detain us long. One of these is that the trial judge abused her discretion by permitting the State to introduce, for purposes of impeaching the appellant's credibility, his prior conviction for carrying a handgun. The short answer is that the point is not preserved for appellate review. Md. Rule 1085. At the end of the State's case, the appellant participated in a bench conference over the pros and cons of testifying in his own defense. It was there ruled that if he testified, the State would be permitted to impeach his credibility by showing a prior conviction for the illegal possession of a firearm. The appellant nonetheless took the stand. In its cross-examination, the State examined the appellant concerning this prior record. No objections were made to any of the questions during the course of the cross-examination.

In *Sutton v. State*, 25 Md.App. 309, 316, 334 A.2d 126 (1975), Judge (now Chief Judge) Gilbert was emphatic on this point:

> "This question is not properly before us inasmuch as the appellant did not object to the questions when they were posed to the appellant. Cases are legion in the Court of Appeals to the effect that an objection must be made to each and every question, and that an objection prior to the time the questions are asked is insufficient to preserve the matter for appellate review."

*See also Funkhouser v. State*, 51 Md.App. 16, 23–24, 440 A.2d 1114 (1982), and cf. *Luce v. United States*, —— U.S. ——, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The appellant attempts to exempt himself from the foreclosing effect of this law by looking to Maryland Rule 4–322(b), which now provides that there may in some circumstances be a continuing objection to evidence. Although we do not believe that the notion of a "continuing objection" has any bearing on the situation at bar, it is unnecessary even to address that issue since the new Maryland Rule only became effective as of July 1, 1984, and the trial now under review took place on August 1, 1983, eleven months earlier.

The appellant's final contention is that he was unduly restricted in his presentation of character evidence. The appellant's mother-in-law was called to the stand by the defense and questioned about his general behavior toward his child. The mother-in-law was not present at the time of the assault in this case. Nonetheless, she was permitted to testify that the appellant cared for his son, provided for his son, and loved his son. Exercising her discretion, the trial judge did not, however, permit an exploration as to why the mother-in-law thought that the appellant was "a good parent to his son." A great deal came out but some limits were placed upon it. This type of evidentiary ruling is a matter preeminently delegated to the discretion of the trial judge. We see no abuse of that discretion.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.