**Selenna M. FLORENCE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 05–CM–159.**

District of Columbia Court of Appeals.

Argued April 11, 2006.

Decided Sept. 21, 2006.

Ewen Allison, appointed by the court, for appellant.

George Hazel, Assistant United States, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, Alexandra F. Foster, Assistant United States Attorney and Edith M. Shine, Assistant United States Attorney, were on the brief for appellee.

Before RUIZ and KRAMER, Associate Judges, and FERREN, Senior Judge.

RUIZ, Associate Judge:

Appellant, Selenna[1] M. Florence, challenges the sufficiency of the evidence to support her convictions, after a bench trial, of assault and attempted second-degree cruelty to children where she presented a defense of parental discipline. The trial court found that appellant did not hit her child for a disciplinary purpose and rejected the defense. Because the trial court overlooked certain defense evidence and imposed too narrow a view on the defense of parental discipline, we reverse.

## I.

The events giving rise to appellant's convictions took place in September 2003. Appellant's daughter, Amber, who was eleven years old at the time, was excused from school early on September 3 so that appellant could take her to an appointment at a medical clinic for obese children at Georgetown University Hospital.[2] Amber testified that she had come home and appellant asked repeatedly that she change clothes and freshen up so that they could leave for the appointment. Instead, Am-

---

1. The spelling of appellant's name in many of the court's documents is with only one "n." Here, we employ the spelling used by appellant in her trial testimony.

2. Amber was, at age eleven, around five feet, five inches tall and weighed 269 pounds. Her mother recounted at trial that special efforts had been made to admit Amber into this weight clinic at the suggestion of her endocrinologist, because her doctors were "worried about her health."

ber went to the kitchen pantry and retrieved a bag of food items given to her by her father that she knew she was not allowed to eat (some hot cocoa and Cup-O-Noodles). Both appellant and her mother (Amber's grandmother) repeatedly asked Amber to give them the bag of food, but Amber refused. Finally, appellant took the bag from Amber, went upstairs, and hid the bag in her bedroom closet. Undeterred by her mother's admonishments, Amber went upstairs and ransacked her mother's room for the food, finally finding the bag in the closet.

Appellant, who had left the bedroom, came back in and took the bag from Amber once again. Appellant and Amber began arguing, and appellant asked her again to change clothes and get ready for her medical appointment. According to Amber, she and her mother pushed each other, and appellant eventually retrieved a curling iron from another room. Mother and daughter struggled over the curling iron, as Amber tried to wrest it from her mother's hands. Appellant hit Amber once on the leg with the curling iron—which was not hot—and twice on the hand when Amber attempted to block the blows to her legs. Amber, who acknowledged that she had pushed and hit her mother on previous occasions, testified that she did not "fight back" because she was afraid she would hurt her mother. Amber then called 911. Amber's grandfather later took Amber to the hospital, where she was given an ace bandage and an ice pack for her hand.

Officer Ronald Proctor testified that he arrived at appellant's home in response to a police radio broadcast reporting an "assault and battery" at appellant's address, and Amber's grandmother answered the door. She told him that she did not know what was going on, and she called Amber to come downstairs. When Amber appeared at the door, Officer Proctor noticed that she was holding her hand, which appeared swollen, and looked like she had been crying. Appellant then appeared at the door, and the officer explained why he was there. Appellant answered the officer's questions, and explained to him that she hit Amber with the curling iron because Amber had an appointment at the Georgetown Hospital clinic and was making them late. Appellant took the officer upstairs to the room and showed the curling iron to the officer.

Appellant's account tracked her daughter's for the most part, but gave greater detail about what happened, provided further information about Amber's past behavior, and explained the mother's motivation in this instance. Appellant testified that during their first argument in the kitchen over the bag of prohibited food items, Amber's grandmother had taken the bag of food from her, which prompted Amber to "snatch" the bag back and get "up in her grandma's face, thus being disobedient, disrespectful." Appellant told Amber to go upstairs and change clothes, and reminded her that her doctor had told her she could not have noodles or hot chocolate. Appellant took the bag away from her and took it upstairs to her closet, because Amber was not allowed to go in her closet without permission. Appellant then returned downstairs and told Amber, again, to go upstairs and change her clothes. Amber, instead, went out the front door and did not return for twenty minutes, until her grandfather came out and ordered her back in. She had ignored her mother's order to come back in the house, gave her "a lot of lip," and was "being very belligerent."

After she came back inside, Amber went upstairs and appellant heard "all this banging and things throwing down," so appellant went upstairs and found that her room "was trashed, had been ransacked." She saw Amber coming out of her closet

with the bag of food, which she snatched from Amber's hands. They both became angry, and Amber "jumped" in appellant's face, being disrespectful, and telling her mother what she (Amber) would and would not do. Appellant "fussed" at Amber for being disrespectful and disobedient, and for tearing up her room; she told her, yet again, to go get dressed for her appointment. Amber was "yelling and screaming" and "throwing a temper tantrum." At this point in her testimony, appellant's story differs somewhat from Amber's account. According to appellant, Amber pushed past her and went into her grandmother's room, where there was a curling iron on the bed. Appellant testified that she followed Amber into the grandmother's room, and they both noticed and grabbed the curling iron at the same time, and began to struggle over it. Appellant finally took possession of the curling iron, and Amber stumbled back. Appellant hit Amber on the leg once with the curling iron, and when she tried to hit her a second time, Amber blocked the hit with her hand, and then started screaming that her hand was broken. Appellant looked at Amber's hand to make sure it was not hurt, and then told Amber to get up and change her clothes. Amber picked up the telephone and called 911.

When asked why she hit Amber with the curling iron, appellant responded:

Because Amber is stronger than I am and when I tap Amber with my hand, Amber doesn't feel it. My hand swells and so the [curling iron was] there and I was a little bit angry for having to continuously tell my daughter what to do and she really needs to be ready for this appointment. They made special prepa-

ration for her to go[,] to fit [her] in this EAT clinic after she had been to the endocrinologist. They were worried about her health and it was very important. I took off from work to take my child and then for her, to have to go through all, you know, her fussing and screaming and hollering and disrespecting me as her mom, talking back, you know, and so that's basically why I hit her with the [curling iron].

Appellant recounted that Amber had frequently misbehaved in the past: destroying her grandmother's property; throwing oranges through the glass vent windows, causing them to break; banging on the walls; writing all over the walls when there was something she did not want to do; slamming doors; and talking back to her grandmother, "getting up in her face." Most recently, the day before this incident, Amber had refused to obey her grandmother and, in protest, repeatedly kicked her grandmother. Amber had also pushed and shoved appellant before. Appellant reiterated that she hit her daughter that day because "she was being disobedient and defiant and belligerent," and "to discipline her because Amber was not listening," noting she had already told Amber that it was not acceptable for her to be aggressive like that, and "just the little hand taps were not, Amber didn't take that seriously."

## II.

■ Appellant does not contest that she hit her daughter with the curling iron, or that—without the defense of parental discipline—the evidence suffices to prove assault and second-degree cruelty to children.[3] She claims, however, that the trial

3. In a prosecution for simple assault, the government must prove, beyond a reasonable doubt, that the defendant made: "(1) an attempt, with force or violence, to injure another; (2) [with] the apparent present ability to

effect the injury; and (3) [with] the intent to do the act constituting the assault." *Macklin v. United States*, 733 A.2d 962, 964 (D.C.1999) (internal quotation marks and citations omitted). Second-degree cruelty to children is

court's findings did not take account of all the evidence she presented in support of her defense of parental discipline, and that the government did not meet its burden to disprove her defense.

■■■ A defendant charged with either assault or cruelty to children may claim the privilege of parental discipline. *See Lee v. United States*, 831 A.2d 378, 380 (D.C.2003). The defense is established where the defendant uses reasonable force for the purpose of exercising parental discipline. *See id.* (*citing Newby v. United States*, 797 A.2d 1233, 1235 (D.C.2002)). Once this defense is raised, the government has the burden of refuting it by proving beyond a reasonable doubt that "the parent's purpose in resorting to force against her child was not disciplinary, or that the force she used was unreasonable." *Id.* at 380–81 (quoting *Newby*, 797 A.2d at 1237; *In re L.D.H.*, 776 A.2d 570, 575 (D.C.2001)).

■■■ In a challenge to the sufficiency of the evidence to support a conviction, "[i]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Nixon v. United States*, 730 A.2d 145, 148 (D.C.1999) (quoting *Zanders v. United States*, 678 A.2d 556, 562 (D.C.1996)) (internal citations omitted). We will reverse, however, if "it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001).

■■■ As the trial court recognized, "this case really rests on a finding of whether this was a reasonable exercise of parental discipline," and whether appellant hit her daughter "out of a desire to inflict pain or was she acting out of a genuine effort to correct the child." In determining that appellant had acted in order "to inflict pain," the court made a related finding that after appellant hit Amber's hand and Amber began to scream that it was broken, "it is clear that the mother did not attempt to get any treatment for Amber's hand or to examine it to see the extent of the injuries." This finding is not supported by the record, as appellant testified that she did examine Amber's hand to determine whether it was broken, and concluded it was not—a conclusion that was corroborated when Amber's grandfather took her to the hospital.[4]

committed when a "person intentionally, knowingly, or recklessly ... [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child...." D.C.Code § 22–1101(b)(1) (2001); *Alfaro v. United States*, 859 A.2d 149, 156 (D.C.2004). To prove attempt, the evidence must establish that appellant had the requisite intent to commit the crime and performed some overt act, beyond mere preparation, toward its commission. *See, e.g., Johnson v. United States*, 756 A.2d 458, 463 n. 3 (D.C.2000).

4. Although the trial court said it "did not believe the [appellant] ... was testifying credibly during large parts of her testimony," the trial court did not say it disbelieved appellant's testimony that she examined Amber's hand and concluded it was not broken, as Amber claimed. In contrast, the trial court expressly noted it did not believe some of the details of appellant's version of the tussle with

Amber over the curling iron, specifically, her explanation that she hit Amber on the leg, after Amber lost her balance and was "stumbling down." According to the trial court, it would not be "physically possible to hit [Amber] two or three times [once on the leg, then on the hand Amber interposed] as she was falling." The trial judge also specifically noted that it disbelieved appellant's testimony about the location of the curling iron—whether it was in the bedroom where they were arguing, or whether appellant went to another room to get it and returned to the bedroom to hit Amber with it. Although we are bound by the trial court's credibility determinations, *see Curry v. United States*, 520 A.2d 255, 263 (D.C.1987), the details of appellant's testimony that the trial court disbelieved did not go to the essence of appellant's defense that she was acting, reasonably, to correct her daughter's oppositional behavior that day and get her to comply. The essential facts that under-

In determining that appellant had not acted to discipline her child, the court noted:

> I see in this case *no indication* that these actions taken by the defendant in a course of what she describes as a fight with her daughter was acting to impose parental discipline nor do I credit her testimony that this was a fight with her daughter. I believe that she went to another room and got a curling iron to use it as a device to hit her daughter with and that she did that because she was angry, not because she was attempting to impose any discipline. *There's no testimony at all that she said anything to suggest that this was done to discipline from either side. There's been no testimony as to that. There's been no testimony to suggest that this was done simply to punish her for misbehavior* and I do not find that under the facts as I have found them in crediting the testimony as I do credit it, that the defendant was acting for any reason other than to inflict pain because of her anger against her daughter.

(Emphasis added.) The trial court concluded that appellant "went to the other room to get the curling iron with a desire to inflict pain but not with a desire, any attempt at parental discipline."

We do not believe the record supports the trial court's findings or conclusions based on its assessment that there was "no indication" and "no testimony" that appellant was acting to discipline her child. To the contrary, there was extensive evidence in this case—uncontradicted by appellant's daughter—that the daughter, who had a history of violent and disruptive behavior, was misbehaving again on this day. She would not obey her mother's orders to get ready for a doctor's appointment that appellant considered to be "very important" because the doctors were "worried about [Amber's] health." Nor would she follow her mother's and grandmother's instructions regarding the food she was not allowed to eat. Amber's testimony corroborated her mother's account on this point.

██ This is not a jurisdiction where physical discipline of children is outlawed; what the law requires is that physical force, if used, must be reasonable and for the purpose of discipline. *See Lee*, 831 A.2d at 380–81. This appears to be the first case in our reported opinions in which the trial court has rejected the defense of parental discipline on the ground that the parent did not have a disciplinary purpose. Our recognition of the parental discipline defense means that the court cannot second-guess a parent's choice of discipline, as long as not excessive, if it is used "in the exercise of domestic authority by way of punishing or disciplining the child—for the betterment of the child or promotion of the child's welfare—and not [ ] a gratuitous attack." *Newby*, 797 A.2d at 1242–43 (quoting *Anderson v. State*, 61 Md.App. 436, 487 A.2d 294, 298 (Ct. Spec.App.1985)).[5] In this regard, the trial

---

lay that defense were not disbelieved by the trial court and were, in fact, corroborated by Amber.

**5.** The full statement of the parental discipline defense that is set forth in the jury instruction on assault is as follows:

> The parent of a minor child is justified in using a reasonable amount of force upon the child for the purpose of safeguarding or promoting the child's welfare, including the prevention or punishment of his/her misconduct. Thus, the parent may punish the child for wrongdoing and not be guilty of assault (1) if the punishment is inflicted out of a genuine effort to correct the child, and (2) if the punishment thus inflicted is not excessive in view of all the circumstances, including the child's age, health, mental and emotional development, alleged misconduct on this and earlier occasions, the kind of punishment used, the nature and location of the injuries inflicted, and any other evidence that you deem relevant.
>
> To be justified, the force must have been used for the purpose of exercising parental

court's observation that because appellant was angry, she could not also be acting with the intent of disciplining her child, unduly restricts the defense of parental discipline. As any parent knows, the two are not mutually exclusive.[6] Appellant admitted she was "a little bit angry for having to continuously tell my daughter what to do," but maintained that she hit her daughter because of her oppositional behavior and to get her to comply, in appellant's words, because "she really needs to be ready for this appointment." This is far from "a gratuitous attack." *Id.* Although a parent's uncontrolled anger can be evidence that physical force is not being applied for a disciplinary purpose or to show that the force used was unreasonable, *see, e.g., Dorsey v. United States,* 902 A.2d 107, 112 (2006) (affirming second-degree cruelty to children conviction where force used by parent "d[id] not appear to be controlled [and] measured"), appellant could simultaneously be angry and be acting lawfully, with the intent to discipline. What the law requires of parents is the use of reasonable force for a disciplinary purpose, not saintliness.

A parent in appellant's position reasonably could conclude that the child needed disciplining, and in considering the type and amount of force to use, reasonably could take into account, as appellant testified, that her daughter, who was much bigger than she, had not responded to lesser degrees of correction, including taps

on the hand. *Cf. Lee,* 831 A.2d at 381 (finding beating unreasonable where mother, after the fact, hit her teenaged daughter with wooden pole where "daughter's transgression was merely a failure to attend her son's day care luncheon"). As long as appellant's actions remained within permissible bounds, appellant was free to discipline her unruly child with physical force.

Because the trial court found that appellant did not act with a disciplinary purpose, it did not expressly address the second *Lee* factor, namely, that even if used for discipline, physical force must not be unreasonable. Nor did the trial court make an implicit or separate finding that, even if appellant were acting with disciplinary intent, the force used was unreasonable. We could not dispute that on the face of it, without amplifying the evidence, a trial judge could find that a parent's hitting an eleven year-old child with a curling iron is unreasonable. But on the additional uncontested facts of this case—especially given the child's size and belligerence—we cannot say that the government has proved beyond a reasonable doubt that appellant's use of the curling iron was unreasonable. No evidence was presented that Amber's hand, though swollen, was seriously injured. Viewed in the context of her previous violent misconduct and the need for immediate correction on this occasion, the measured manner in

discipline and must be reasonable. The defendant is not required to prove that his/her conduct was a justifiable exercise of reasonable parental discipline. Rather, the government must prove beyond a reasonable doubt that the defendant's conduct was not so justified.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06 (4th ed. 1993), *quoted in Newby,* 797 A.2d at 1242 n. 12.

6. Nor do we think that a disciplinary purpose is necessarily excluded by the parent's knowl-

edge that punishment will be painful to the child, so long as it is within reasonable bounds; the corrective action of punishment may derive from painful punishment, at least in part, because of the child's desire to avoid similar pain in the future. We understand the trial court's observation in this case, however, to be that appellant's sole purpose was to hurt her daughter, not to correct her. As we conclude, we do not agree that the evidence, viewed as a whole, supports that conclusion beyond a reasonable doubt.

which appellant used the curling iron to hit her daughter on the leg and hand was not evidently unreasonable. *See, e.g., Lee,* 831 A.2d at 381 ("The circumstances to be considered when determining whether the punishment was unreasonable include 'the child's age, health, mental and emotional development, alleged misconduct on this and earlier occasions, the kind of punishment used, the nature and location of the injuries inflicted, and any other evidence that [may be] relevant.") (*citing* DISTRICT OF COLUMBIA CRIMINAL JURY INSTRUCTION No. 4.06, *supra* note 5); *cf. Dorsey,* 902 A.2d at 111–12 (finding unreasonable force where father struck his son with a belt across the face, which, according to a doctor's testimony, endangered his eye socket, and also struck him multiple times on his leg, arm, back, and chest); *Lee,* 831 A.2d at 381 (noting that trial court had medical evidence and pictures of contusions and abrasions to daughter's shoulders and legs from being hit with a wooden pole); *see also* D.C.Code § 16–2301(23)(B)(I) (2004 Supp.) (giving examples of child abuse that cannot constitute reasonable discipline, including "burning, biting, or cutting a child," "striking a child with a closed fist," or "using [a dangerous] weapon on a child"), *cited in In re Kya.,* 857 A.2d 465, 471, n. 9 (D.C.2004).

In sum, because the record does not support that there was "no testimony" indicating that appellant was acting with a disciplinary purpose, the government had the burden of disproving the defense of parental discipline beyond a reasonable doubt. The evidence of record (even as described by Amber herself), replete with descriptions of the daughter's misbehavior, appellant's several attempts to get her to comply with the doctor's instructions as to diet and to get ready to attend a medical appointment, the manner in which appellant used force, after which she told Amber, once again, to go get dressed—emphasizing that the purpose of the punishment was to discipline her and achieve her compliance with appellant's repeated requests that she get ready to go to the doctor—as a matter of law created at least a reasonable doubt that appellant was acting to discipline her child and that she used reasonable force in doing so. *See Curry,* 520 A.2d at 263.

Appellant's convictions are, therefore, overturned, and the case is remanded for entry of a judgment of acquittal.

*So ordered.*