10 A.3d 854

**Daniel GENIES**

**v.**

**STATE of Maryland.**

**No. 753, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Dec. 28, 2010.

Bradford C. Peabody (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: JAMES R. EYLER, WOODWARD and J. FREDERICK SHARER, (Retired Specially Assigned) JJ.

SHARER, J.

Appellant, Daniel Genies, was charged by criminal information in the Circuit Court for Montgomery County, with both common law indecent exposure in a public place (Count One), and indecent exposure by an inmate in the presence of a correctional officer in violation of Md.Code (1999, 2008 Repl. Vol.), § 8–803 of the Correctional Services Article ("C.S.") (Count Two). Appellant was convicted by a jury of common law indecent exposure and acquitted of statutory indecent exposure by an inmate in the presence of a correctional

officer. Appellant was sentenced to three years imprisonment, with credit for time served.

Appellant timely appealed and presents the following two questions for our review:

1. Did the trial court err in failing to dismiss Count One, charging common law indecent exposure?

2. Did the trial court err or abuse its discretion in denying his motion for new trial, without holding a hearing?

Finding neither error nor abuse of discretion, we shall affirm.

## BACKGROUND

### Preliminary discussions

On October 25, 2008, while appellant was being detained in the medical unit of the Montgomery County Correctional Facility, appellant exposed himself in the presence of Corporal N. Goodridge, a female correctional officer.[1] The State charged appellant by way of criminal information containing two counts. Count One charged that appellant "did knowingly and willingly and indecently expose his penis to N. Goodridge in a public place. . . ." Count Two charged that appellant "while an inmate at the Montgomery County Correctional Facility, did lewdly and lasciviously and indecently expose his penis in the presence of Officer N. Goodridge with the intent to annoy and abuse and torment and harass and embarrass Officer N. Goodridge. . . ."[2]

---

1. At her request, and as approved by the court, Corporal Goodridge's first name was not included in the record.

2. C.S. § 8–803 provides as follows:

 **§ 8–803. Indecent exposure by inmate in the presence of a correctional officer or authorized personnel.**

 (a) *Definitions.*—Words or phrases in this section that describe the common-law crime of indecent exposure shall retain their judicially determined meanings except to the extent expressly or implicitly changed in this section.

 (b) *Prohibited conduct.*—An inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or author-

Prior to jury selection, appellant moved to dismiss the count charging common law indecent exposure on the grounds that, if any prohibition applied to appellant's conduct, the specific statutory offense alleged under Count Two was applicable in this case.[3] In response, the prosecutor informed the court that the indecent exposure occurred in a medical ward where civilians were also employed. The State argued that, based on the Court of Appeals's opinion in *Wisneski v. State*, 398 Md. 578, 921 A.2d 273 (2007), if common law indecent exposure could occur in a private residence, it could also occur in a medical facility where civilians were employed.

The court reviewed the statement of probable cause, which indicated that the exposure occurred in "the medical housing area," and asked for further argument from appellant's counsel. Counsel responded that, although appellant was in the medical unit, he was nevertheless in a cell at the time alleged.

Again considering the statement of probable cause, the court ascertained that the State was alleging that the exposure was witnessed only by Officer Goodridge. Further, the statement of probable cause indicated that the alleged exposure took place in a medical housing cell, in an area that "was in the open, directly in front of a large window with direct view of the common walkway, and anything out of the ordinary could have been witnessed by any person passing by the area." Based on this, the court stated: "I don't think it's appropriate for me, at this stage of the game, before we've had any testimony, to simply tell the State that they can't present it to the jury."

---

ized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel.

(c) *Penalty.*—An inmate who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

Md.Code (1999, 2008 Repl.Vol.), § 8–803 of the Correctional Services Article.

**3.** While defense counsel did not specifically state the motion was a motion to dismiss, the trial court treated it as such when it ultimately denied the motion.

After jury selection, the court recessed for the day. The next day, before hearing testimony, appellant's counsel offered further argument suggesting that, under principles of statutory construction, a specific statute will control over a more general one. The court responded that common law indecent exposure may be a lesser included offense, but that "it's going to depend on what the facts are." The court again observed that the State alleged that the exposure was in an area that could be seen by the public.

Indeed, the State then proffered that the exposure occurred in an area where "not only do tour groups go through at all times, members of the public are always coming through." The State continued that "[t]his is the medical ward, there are civilians that work there, as well as other people and Mr. Genies would have had no idea at any point whether or not these people would have been coming through." The prosecutor also suggested that, since the statutory offense required proof of specific intent, the State's strategy was to proceed on the common law offense should the jury be unable to find that specific intent.

After hearing further argument from defense counsel, the court reiterated that "it's probably going to be a jury issue." The court then permitted defense counsel to make an objection to the State's opening statement to the extent that statement referred to common law indecent exposure. However, the court ruled it was "going to deny your motion to dismiss at this time unless I have an epiphany when I look at some of these cases."

### The evidence

The State's primary witness, Corporal N. Goodridge, a correctional officer assigned to the Montgomery County Correctional Facility, told the jury that, on October 25, 2008, she was working in the medical area, which was "like the infirmary. Inmates are housed there. They have a condition that they cannot be housed with regular inmates." Appellant was in a room in that area designated as Negative Airflow No. 2. Corporal Goodridge explained that a "negative airflow" room

was a room for individuals with contagious disease or for individuals who need the bed for other medical reasons.

Photographs of that room were admitted into evidence at trial.

Corporal Goodridge testified that she began her shift on October 25, 2008, at 6:30 a.m., and began to make her rounds to perform an institutional count at 7:00 a.m. As she entered the hallway, she "announced 'female officer on floor, I will be here with you guys all day today', and I started my count." As she started her shift, appellant began to knock on the window to his room "to get my attention." Corporal Goodridge told him: "I am counting now Genies, you know you cannot interrupt me, and I continued my count." Appellant's eyes were open, he was awake, and he was "at the window. The bed is right is [sic] against the open glass window."

Corporal Goodridge testified that she inspected the area every 20 minutes. During her inspection at 8:20 a.m., appellant knocked on the window and asked for the nurse. At 8:40 a.m., Corporal Goodridge accompanied the nurse into appellant's room while the nurse checked on appellant's welfare. Goodridge actually stayed near the door during this encounter. After the check, Corporal Goodridge secured the room and continued her rounds. Appellant also knocked to get Corporal Goodridge's attention during her 9:00 a.m. round.

At approximately 10:45 a.m., Corporal Goodridge, accompanied by Nurse Tracy, was escorting another inmate in handcuffs through the area, "[a]nd there [appellant] was, he had his penis exposed that the inmate was with me and I said, Genies. I looked him in the eye, said Genies, put it away what are you doing, put it away." [4] On cross-examination, Corporal Goodridge clarified that appellant was laying on his bed while he was masturbating. Corporal Goodridge testified that appel-

---

4. Nurse Tracy's full name does not appear in the record and Corporal Goodridge did not know if Nurse Tracy was a correctional employee. In addition, Goodridge testified that this other unidentified inmate was being escorted past appellant's cell to another cell where Nurse Tracy was going to tend to his medical condition.

lant was stroking his penis up and down, and that she saw it for a few seconds. After she told appellant to put it away, appellant "looked me in the eye, had a smile on his face and he continued more vigorously."

While his penis was exposed, appellant "had a white shirt pulled up above his, right onto his chest area and some boxers pulled to like on his leg area, his lap area." Appellant was very close to the window, and was approximately three to four feet away from Corporal Goodridge.

Corporal Goodridge continued escorting the other inmate to a cell, and then returned to the area near appellant. Appellant still had his penis exposed, and Goodridge again told him to "put it away." Goodridge testified that someone in that cell would have been able to hear what she was saying, and, after defense counsel objected to portions of Goodridge's testimony, the court clarified that "[y]ou can hear through the glass she indicated in that cell."

Corporal Goodridge then called for assistance over her county-issued radio because appellant would not "put his penis away." According to Goodridge, appellant "proceed[ed] to dip his hand in a jar, grease that he had at the side of the bed, and he continued going more vigorously, looking at me and smiling. And while I was standing there he just ejaculated."

Corporal Goodridge then testified concerning the area where this incident occurred, saying that civilians work in the medical unit as nurses and maintenance staff. Further, "[w]e have non-uniform staff that comes through there, they might have to interview an inmate. We have counselors that come through there." In addition, "[w]e have tours that come through there, even on a Saturday," and sometimes those tours are not announced ahead of time.

On cross-examination, Corporal Goodridge agreed that appellant was incarcerated as an inmate, that he was alone in the room, was not free to leave, and that the room was locked. The room contained a bed, a shower with a shower curtain, a television, a chair, a wheelchair, and a toilet and a sink. Goodridge also confirmed that there were no blinds on the

window into the room. In addition to providing more detail about appellant's room, Corporal Goodridge also testified concerning the other rooms in this medical unit.

The State's only other witness was Sergeant Christian Campbell, a supervisor at the correctional facility. On the day in question, Sergeant Campbell responded to Corporal Goodridge's call for assistance and found her to be "very upset," "angry," and "expressing disgust with what had happened . . ." When asked who had access to the medical unit, including the area near the rooms in question, Sergeant Campbell responded that "[a]ctually, many people. Staff, counseling staff, pastoral staff, even we have tourists that even go through there." On cross-examination, Sergeant Campbell agreed the day in question was a Saturday, but also confirmed that tours do come through on Saturdays as well.

After the State rested its case-in-chief, defense counsel moved for judgment of acquittal on Count One, common law indecent exposure, on the grounds that it alleged the same conduct as Count Two, indecent exposure by an inmate in the presence of a correctional officer. The court took that under advisement and asked for argument on Count Two.

As to Count Two, appellant's counsel argued that appellant did not have the specific intent to annoy, abuse, torment, harass, or embarrass Corporal Goodridge, because he thought he was "in the privacy of his own cell alone, doing something discretely at a time that he thinks nobody will come by." Further, Corporal Goodridge just "happens to come by, but he doesn't say anything other than the act itself which he's in the middle of and can't stop until he stops."

The State, as to Count One, common law indecent exposure, asserted that it had made a *prima facie* case because there was evidence that the area could be accessed by members of the general public, including nurses, other inmates, tours, pastoral staff, and civilian employees that could include other correctional officers. As to Count Two, the State insisted that there was enough evidence that appellant, an inmate, exposed

himself with intent to annoy, abuse, torment, harass or embarrass Corporal Goodridge, a correctional officer.

The court ruled that, looking to the evidence in the light most favorable to the State, and considering the holding of *Wisneski, supra,* that "I'm really not able to distinguish a great deal of difference between a private residence and where he was." Noting that there was a nurse and another prisoner present when appellant first exposed himself, the court denied the motion as to Count One. The court also agreed that there was sufficient evidence from which an intent to annoy or embarrass could be inferred, including the fact that appellant made eye contact with Officer Goodridge and smiled, and that Officer Goodridge told him in a "loud, clear, alarmed, upset voice to put his penis away ..." The court likewise denied the motion as to Count Two. After further argument by appellant's defense counsel, the court clarified that it had not ruled out the argument that the specific count controlled over the general count, but that, at this time, it was inclined to read the counts as "two distinct charges."

Appellant testified on his own behalf. He told the jury that he was in the medical unit on October 25, 2008, because he had had a catheterization performed the day before at Washington Adventist Hospital in Takoma Park. Appellant was on bed rest at the time, had a hard time moving, and could not be returned into the general population.

As to the specific incident alleged, appellant testified that he was familiar with the schedule of the guard's rounds, and believed there would be a count taken at 11:00 a.m. He did not expect to see any officers at 10:45 a.m. because the officer had already been by, and he thought the next round would be at 11:00 a.m. Appellant further testified that, after the nurse saw him that morning, he did not have any further conversations with Officer Goodridge. He also did not knock on the window after that time.

Appellant admitted that he was masturbating, but that he did not try to get anyone's attention, nor did he want anyone to see him. Appellant did not see Officer Goodridge while he

was masturbating, nor did he hear her. Appellant further testified that he did not intend to annoy, abuse, harass, torment, or embarrass Officer Goodridge. Appellant maintained that he did not see Officer Goodridge and did not hear her give him an order for him to stop.

On cross-examination, appellant agreed that the window into the room was "pretty big," and "pretty much has your entire bed on display." When asked whether he had an "urge to masturbate that day," appellant agreed that he knew that people were walking about in the area. He also agreed that he knew that nurses walk in the area, that they did not come by on a regular schedule every 30 minutes, and that they would come into the area whenever another inmate called for them. Appellant also knew he was not the only person in the area. Finally, appellant agreed that, if someone saw him masturbating, that might embarrass or annoy them.

The State presented no rebuttal evidence. Appellant's counsel renewed her motion for a judgment of acquittal, again contending that Count Two was a specific intent offense and that Count One was a general intent offense. Counsel argued that both counts should not go to the jury because Officer Goodridge was the only victim in this case, positing that "you are saying okay, the same victim, we have to determine whether Mr. Genies did something in a specific intent, but also, did he just generally intend it? Obviously, the legislator [sic] didn't intend that to happen because that's why they made [C.S. §] 8–803. So, I just don't see how we can have those together."

The State responded that the statutory offense did not prevent also charging under the common law because the statute "only addresses a very specific intent to annoy, harass, embarrass a correctional officer." By way of example, the State asked "then can an inmate just masturbate at great length whenever he so feels like in front of another inmate? Does that inmate simply stop being a member of the public because he's an inmate?"

The State also observed that C.S. § 8–803 did not indicate that "it surpasses or does not allow for prosecution under the common law." The State offered the example that, in other cases, it was common for the State to charge both burglary in the first degree with specific intent, as well as simple breaking and entering "in case the jury is not able to reach that a specific element has, having been proven by the State, the catchall breaking and entering exists." The State also analogized the situation to an assault on a Department of Corrections employee. While there is a specific statute that applied to such an incident, the State could still charge second degree assault, a general intent crime.[5]

After hearing further argument from defense counsel, the court ruled that the counts had been properly charged:

I think it's properly framed. I understand your argument that since they only charged the officer, that the more specific controls over the general, but there's no problem with the charge as crafted. And the facts are such that there was an inmate and that there was a nurse there as well.

And the facts are such and your client's testified, he knew the different times the nurses would walk by, and it could be prisoners came by, and he may have hoped or expected that he would not be seen, but he certainly could have taken other preventative actions if nothing more than to cover himself with a sheet.

---

**5.** Section 3–203(a) of the Criminal Law Article prohibits a person from committing an assault, and a violation of that provision is considered a misdemeanor. *See* Md.Code (2002, 2010 Supp.), C.L. § 3–201(a) and (b). Section 3–203(c) of that article makes it a felony to cause physical injury to another person if the person knows or has reason to know the other is a law enforcement officer, which includes a correctional officer, while the officer is engaged in the performance of their official duties. *See* C.L. § § 3–201(c), 3–203(c). With respect to inmates convicted of assault against another inmate or an employee of a correctional facility or sheriff's office, C.L. § 3–210 of the Criminal Law article provides that the inmate shall be sentenced consecutively to any sentence the inmate was serving at the time of the crime, or that had been imposed but was not yet being served. *See* C.L. § 3–210.

You know, walk behind the shower curtain, I mean, there's a number of things he could do. I assume they have some privacy set up there for a shower so that, you know, you can take one without being seen.

So, you know, I think those are factual issues for the jury. You know, I'm, it's obvious I'm really wresting with it, I don't, there's nothing, there's really nothing on it and I don't have a case[ ] that I can fit into it. This *Wisneski* case, quite honestly really is, I mean, there's a dissent in the case that's basically we have ruled. You know this isn't what the common law was, it didn't envision this kind of offense. And now we are in the are[a] that's restricted, maybe, maybe even more restricted but for analysis purpose it's not a lot of difference between a private residence and a jail. Because there is a control as to who you let in and who you don't let in. Now, he has less control over that and then his action, his actions have to be judged factually by the jury, so it's not, I don't think it's an easy decision. To me it would be if *Wisneski* wasn't out it probably would be a lot, it would be definitely a lot easier for the Court.

After further discussion about jury instructions, the court continued:

I'm going to go forward on both.

 \* \* \*

There may be something out there, but I just can't find it and I think that there are two separate and distinct defenses [sic] I think that you can be guilty of a crime of indecent exposure since the *Wisneski* case under a setting similar to what we have in the jail, in the medical unit in this case.

I think that the, and I have crafted instruction for that, and I have crafted an instruction for indecent exposure by inmates which indicates which [sic] that it's a specific intent crime. It has to have more than just the intention to expose your penis in a public place.

So, I am going to deny the motion and, I guess, you know, I do believe that they would merge for sentencing purposes

certainly. So, you know, I don't know whether we'll have an issue when all is said and done or not.

We might and then, perhaps you can make the journey up to the big house in Annapolis and argue this case [DEFENSE COUNSEL], in front of my personal heroes. But, so I am going to deny your motion again, although I think it's well made and it's interesting, and that's why this case has taken so long because of this issue or these issues in connection with the specific charge. But it's one that certainly had to be raised and I'm glad you raised it. It's, as I say, I think it's interesting.

## DISCUSSION

### 1. The Indecent Exposure Counts

■ Appellant maintains on appeal that, by enacting C.S. § 8–803, the "Maryland legislature had intended that the statutory, specific intent crime charged in Count 2 had preempted the field, with respect to indecent exposures by inmates to a correctional officer." The State responds that common law indecent exposure and indecent exposure by an inmate in the presence of a correctional officer are distinct offenses, and that "the jury was free to determine if the State met its burden of presenting evidence sufficient to support a conviction for either offense." For the following reasons, we agree with the State.

The Court of Appeals has set forth the standard of review for legal sufficiency of evidence following a jury trial as follows:

Our standard of review for sufficiency of trial evidence is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" when the evidence is presented in the light most favorable to the State. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted) (emphasis in original). The jury as fact-finder "possesses the ability to 'choose among differing inferences that might possibly be made from a factual situation' and [the appellate

court] must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." *State v. Suddith*, 379 Md. 425, 430, 842 A.2d 716, 719 (2004) (citations and footnote omitted). If the evidence "either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]" then we will affirm the conviction. *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323, 331 (1998).

*Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009); *see Hebron v. State*, 331 Md. 219, 233–234, 627 A.2d 1029 (1993) (observing that determining the legal sufficiency of the evidence is entrusted to the trial judge); *Burns v. State*, 149 Md.App. 526, 547, 817 A.2d 885 (2003) (providing that an assessment of the legal sufficiency of the evidence is whether the trial judge was correct in allowing the case to go to the jury); *see also Moore v. State*, 388 Md. 446, 452, 879 A.2d 1111 (2005) ("Interpretation of a statute is a question of law, and, therefore, we review *de novo* the decision of the Circuit Court."); *Burlas v. State*, 185 Md.App. 559, 568, 971 A.2d 937 (in a non-jury trial, stating that the "assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law"), *cert. denied*, 410 Md. 166, 978 A.2d 245 (2009).[6]

---

6. The State suggests that our standard of review is the same as a review of a denial of a motion to dismiss. *See Whittlesey v. State*, 326 Md. 502, 521, 606 A.2d 225 (in reviewing a ruling on a motion to dismiss, the appellate court will "make an independent constitutional appraisal of the propriety of the denial of the motion to dismiss by applying the relevant law to the given facts"), *cert. denied*, 506 U.S. 894, 113 S.Ct. 269, 121 L.Ed.2d 198 (1992). Although appellant moved to dismiss Count One prior to trial, given that the court's overall ruling at that time was that it wanted to hear the facts in the case before assessing whether to dismiss the count, we will address this issue as whether the court erred in denying appellant's motion for judgment of acquittal. In any event, our standard of review is essentially the same given that we must assess whether the trial court erred as a matter of law in

Prior to the enactment of C.S. § 8–803, indecent exposure was defined in Maryland under the common law as follows:

> The authorities ... are in substantial accord that at the common law indecent exposure was the wilful and intentional exposure of the private parts of one's body in a public place in the presence of an assembly. Thus, its main elements were the *wilful exposure*, the *public place* in which it was performed, and the *presence of persons* who saw it.

*Wisneski*, 398 Md. at 591, 921 A.2d 273 (quoting *Dill v. State*, 24 Md.App. 695, 698–700, 332 A.2d 690 (1975)); *see also Messina v. State*, 212 Md. 602, 605, 130 A.2d 578 (1957) ("Indecent exposure in a public place in such a manner that the act is seen or is likely to be seen by casual observers is an offense at common law.").

In 2002, the Legislature enacted C.S. § 8–803, which provides, in pertinent part, as follows:

> (a) *Definitions.*—Words or phrases in this section that describe the common-law crime of indecent exposure shall retain their judicially determined meanings except to the extent expressly or implicitly changed in this section.
>
> (b) *Prohibited conduct.*—An inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel.

 Appellant posits that, by enacting C.S. § 8–803, the Legislature intended to preempt the field with respect to such offenses and that, therefore, he could not be charged with common law indecent exposure. However, the general rule in Maryland is that repeal of the common law by implication is disfavored. As the Court of Appeals has explained:

> It is a generally accepted rule of law that statutes are not presumed to repeal the common law "further than is ex-

---

submitting both counts to the jury. *See Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006) ("where an order [of the trial court] involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review").

pressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law." *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 356 (1934) (quoting 25 R.C.L. 1054). Where a statute and the common law are in conflict, or where a statute deals with an entire subject-matter, the rule is otherwise, and the statute is generally construed as abrogating the common law as to that subject. *Id.*, 172 A. at 356 (citing SUTHERLAND ON STAT. CONST. § 294; 12 C.J. 186); *Watkins v. State*, 42 Md.App. 349, 353–54, 400 A.2d 464, 467 (1979). *See also Irvine v. Rare Feline Breeding Center, Inc.*, 685 N.E.2d 120, 123 (Ind.Ct.App.1997) ("An abrogation of the common law will be implied . . . where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law . . . ." (citation omitted), *transfer denied*, 698 N.E.2d 1183 (Ind.1998)).

*Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698 (1999); *see also State v. North*, 356 Md. 308, 312, 739 A.2d 33 (1999) ("This view, generally disfavoring repeal of the common law by implication, has a long history in Maryland.").

Considering whether the Legislature either did or intended to repeal common law indecent exposure under these circumstances requires us to apply the well-settled principles of statutory construction:

> Our predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written and in a commonsense manner. We do not add words or ignore those that are there. If there is any ambiguity, we may then seek to fathom the legislative intent by looking at legislative history and applying the most relevant of the various canons that courts have created.

*Downes v. Downes*, 388 Md. 561, 571, 880 A.2d 343 (2005).

Looking to the plain language of C.S. § 8–803, appellant suggests that the language in subsection (a) that common law

indecent exposure retains its judicially determined meaning, "except to the extent expressly or implicitly changed in this section," supports his view that an inmate charged with indecent exposure to a correctional officer may only be charged under C.S. § 8–803. The State does not expressly address this specific argument, but maintains that § 8–803 creates "a new offense, distinct from common law indecent exposure, with different required elements for a violation."

While there is no express provision in C.S. § 8–803 stating that the Legislature meant to repeal the common law, we note that subsection (a) generally retains the common law definition of indecent exposure, except as changed by the section. That express or implicit change applies to the specific conduct prohibited by subsection (b), *i.e.*, indecent exposure with a specific intent in the presence of a correctional officer or authorized personnel. While it is arguable that the Legislature intended such specific conduct to be charged under C.S. § 8–803, it is not clear that the Legislature also intended that other types of indecent exposure by inmates could not be charged. Accordingly, finding an apparent ambiguity in this statute, we look to the legislative history in order to determine whether, by enacting § 8–803, the Legislature intended to preempt the field concerning indecent exposure by inmates in a correctional facility.

Based on our examination of that history, it appears that a significant factor informing the legislative process was a memorandum opinion issued by the Circuit Court for Anne Arundel County, Maryland. *See* Testimony of Richard J. Baker, Superintendent of Anne Arundel County Department of Detention Facilities on SB 429 (February 12, 2002). According to written testimony in the history, at some point prior to consideration of the bill that would enact C.S. § 8–803, Senate Bill 429, the Circuit Court had reversed indecent exposure convictions of two inmates "on the grounds that a correctional facility is not a public place and therefore, the law against indecent exposure does not apply." *Id.* at 2. Specifically, the Circuit Court had ruled:

"Correctional officers have a difficult enough job in keeping themselves and the inmates safe, without having to be subjected to conduct such as expletive-laden communications or vulgar, disgusting and repulsive acts such as the Defendant has repeatedly committed." [However,] "[a]s much as the Court would like to penalize Defendant for his abhorrent conduct, it may not, as such conduct does not fall within the boundary of the common law offense of indecent exposure."

*Id.* (further citation omitted).

Apparently in response to the Circuit Court's ruling that a correctional facility was not a "public place" where the crime of common law indecent exposure could be committed, several legislators proposed Senate Bill 429 in order to make clear that such conduct amounted to criminal behavior. Notably, in a letter from three senators contained within the history is the following:

[Senate Bill] 429 prohibits inmates from indecently exposing themselves in the presence of correctional officers or authorized personnel. Current law defines indecent exposure as the willful and intentional disclosure of the private parts of one's body in a public place. However, inmates who expose themselves within the confines of a correctional facility cannot be charged with indecent exposure because correctional facilities are not open to the general public and, therefore, do not fall into the definition of a public place.

Letter from Senators Jimeno, DeGrange, and Neall re: SB 429 (February 12, 2002).

Additionally, according to the Floor Report on SB 429, [a]ccording to testimony, this bill is intended to address behavioral problems in the corrections system involving inmates (usually male inmates) who intentionally expose themselves to corrections officers and personnel (often female), creating a hostile working environment for the personnel.

Floor Report of the Senate Judicial Proceedings Committee for Senate Bill 429 of 2002.

The legislative history suggests that the Legislature intended to crystallize that specific conduct by an inmate, *i.e.,* lewd, lascivious, and indecent exposure with a specific intent in the presence of correctional officers or authorized personnel, amounted to a misdemeanor. We cannot conclude, however, that the Legislature also intended to preempt the common law in this specific area.

Our discussion of the concept of legislative preemption of the common law in *Anderson v. State,* 61 Md.App. 436, 487 A.2d 294, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985), provides guidance. There, this Court considered whether the enactment of the child abuse statute "preempted a particular corner of the field of common law assault and battery and thereby repealed it." *Id.* at 439, 487 A.2d 294. More specifically, we defined the issue as "whether the Child Abuse Statute has preempted the field and, therefore, repealed common law assault and battery within a factual situation where one *in loco parentis* is guilty of using immoderate force in the course of exercising domestic authority over a child." *Id.* at 448–49, 487 A.2d 294. We held that the new statute did not preempt the common law of assault and battery. *Id.* at 449, 487 A.2d 294.

We recognized that the general rule in such instances was that " '[n]o statute is to be construed as altering the common law, further than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.' " *Id.* at 450, 487 A.2d 294 (quoting 3 Sutherland, *Statutes and Statutory Construction* 41 (Sands ed. 1974)). We then observed that, "[i]n enacting, and subsequently amending, the Child Abuse Statute, the Legislature has never, even obliquely, intimated any intention of repealing or replacing common law assault and battery." *Anderson,* 61 Md.App. at 452, 487 A.2d 294.

By way of analogy, in *Anderson* we discussed *State v. Gibson,* 4 Md.App. 236, 242 A.2d 575 (1968), *aff'd,* 254 Md. 399, 254 A.2d 691 (1969). In *Gibson,* we concluded that, in enacting the statutory offense of manslaughter by automobile, the

Legislature meant to preempt a charge of involuntary manslaughter where the instrumentality of that type of homicide was an automobile. *Gibson,* 4 Md.App. at 247, 242 A.2d 575.

In discussing *State v. Gibson,* we observed in *Anderson* that the enactment of manslaughter by automobile was "intended to provide a more lenient treatment for that broad and easily identifiable category of cases where death had resulted from the negligent operation of a motor vehicle." *Anderson,* 61 Md.App. at 455, 487 A.2d 294. We explained:

> When the direction from the common law crime to the statutory crime is downward in terms of available punishment, what emerges is a clearly identifiable legislative intent to mitigate the harshness of the common law and to deal with the proscribed conduct in a more lenient fashion.

*Id.* at 456, 487 A.2d 294.

In contrast to *Gibson,* in *Anderson* we concluded that in enacting the statutory offense of child abuse, "the direction from the common law to the statutory crime is unmistakably upward." *Anderson,* 61 Md.App. at 456, 487 A.2d 294. Further, "[w]hen the Legislature singles out conduct which is directly, or in significant measure, an aggravated form of already proscribed behavior, the direction is upward in terms of harshness." *Id.* Although we recognized the "strange anomaly created by the open-ended nature of the common law punishment for simple assault," that enactment of the statutory assaults, "with significant maximum penalties provided, are clearly intended to deal more harshly with the aggravated form of the crime." *Id.* Accordingly, "[w]hen the obvious legislative intent is to deal more harshly with aggravated forms of already criminal behavior, there is no inherent incompatibility between the greater and lesser crimes; there is no preempting of the field and no repeal of the lesser, common law crime." *Id.* at 457, 487 A.2d 294.

We further explained:

> Where the direction of the law is by way of ameliorating its former harshness, we do not permit arbitrary fact finding or arbitrary charging decisions to avoid that intended amelio-

ration. Where, however, the direction of the law is by way of making available harsher treatment, we do permit possibly arbitrary fact finding and possibly arbitrary charging decisions to avoid the available, but not compelled, harsher treatment. The prohibition against arbitrary charging decisions and arbitrary verdicts is one-directional. We provide a ceiling, but not a floor.

*Id.*

■ Applying this analysis, we begin by recognizing that the possible penalty under C.S. § 8–803(c), three years imprisonment and/or a $1,000 fine, is the same as the penalty for common law indecent exposure under C.L. § 11–107.[7] However, the sameness of penalties is not determinative. Based on the legislative history, we conclude that, by enacting C.S. § 8–803, the Legislature did not intend to ameliorate any possible consequences of a charge of indecent exposure by an inmate. Instead, the history suggests that the opposite is true.

It appears that the Legislature intended to address interpretations of law that reversed convictions of common law indecent exposure by an inmate because such exposure could not be conducted in a "public place." Our reading of the legislative history suggests that the Legislature enacted C.S. § 8–803 to make clear that such conduct, committed with a specific intent against certain individuals in the correctional system, was, indeed, proscribed conduct. Thus, the direction of the law is to make available harsher treatment, which includes the possibility that prosecutors may, in their discretion, choose to charge both common law indecent exposure and indecent exposure by an inmate pursuant to C.S. § 8–803.

Our conclusion is also supported by *Wisneski, supra,* the case relied upon by the trial court. Subsequent to the enactment of C.S. § 8–803, the Court of Appeals in 2007 clarified

---

**7.** That statute provides: "A person convicted of indecent exposure is guilty of a misdemeanor and is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both." *See* C.L. § 11–107.

the meaning of a "public place" for purposes of assessing common law indecent exposure.

Eugene Wisneski was a visitor in the home of Bridgette Penfield, along with Brandon James. *Wisneski*, 398 Md. at 580, 921 A.2d 273. All three were talking, and Wisneski and Penfield were drinking beer. *Id.* Brandon James left approximately two hours later, and then, after another five hours, James returned to Penfield's home accompanied by his 15–year–old sister, Jennifer James. *Id.* After about 20 minutes, "Wisneski asked Jennifer if she 'was on her period,' stood up, and exposed his penis and testicles to her, shaking them and repeating the question of whether 'she was on her period.' " *Id.* at 581, 921 A.2d 273 (footnote omitted). Jennifer immediately turned her head away while Wisneski, after clothing himself, continued to grab his genitals outside his shorts and shake them in Jennifer's direction. *Id.* After Jennifer's brother, Brandon, became enraged and challenged Wisneski to fight, Wisneski abruptly left Penfield's home. *Id.* Wisneski was arrested and charged with indecent exposure. *Id.* at 581 n. 3, 921 A.2d 273.

Wisneski moved for judgment of acquittal on the grounds that Penfield's home did not constitute a "public place," as required by the definition of indecent exposure. *Id.* at 585, 921 A.2d 273. The trial court denied the motion, ruling: "[A]s I read the definition, if it occurs under circumstances where it could be seen by other people if they happen to look, that constitutes a public place." *Id.* Wisneski was convicted by the jury of indecent exposure, as well as other unrelated counts. *Id.* at 586, 921 A.2d 273.

This Court affirmed. *Wisneski v. State*, 169 Md.App. 527, 905 A.2d 385 (2006). We relied on prior case law that provided "[w]hat constitutes a public place within the meaning of this offense depends on the circumstances of the case." *Id.* at 551, 905 A.2d 385 (quoting *Messina*, 212 Md. at 605, 130 A.2d 578). We therefore held that, under the circumstances of the case, Wisneski's conduct constituted indecent exposure in a "public place," stating:

We do not construe the definition of "public place" so narrowly as to apply solely to places that are physically located outdoors or open to the public at large, without any restriction. Looking again to the dictionary definitions cited earlier, appellant's unsolicited conduct was public in the sense that it occurred in the open and was observed by others.

*Id.* at 552, 905 A.2d 385.

The Court of Appeals affirmed. *Wisneski,* 398 Md. at 604, 921 A.2d 273. Defining the issue presented as whether an indecent exposure that occurs within a private residence can constitute a "public" exposure, the Court began by examining the history of the common law offense. *Id.* at 588–93, 921 A.2d 273. Based on this jurisprudence, the Court stated that the elements of indecent exposure are: "a public exposure, made wilfully and intentionally, as opposed to an inadvertent or accidental one; which was observed, or was likely to have been observed, by one or more persons, as opposed to performed in secret, or hidden from the view of others." *Id.* at 593, 921 A.2d 273. As to the "public" aspect, the Court stated that "it is obvious that the defendant must have 'published' his indecent exposure at such a time and place that anyone who happened to have been nearby could have seen it, had he looked." *Id.* at 595, 921 A.2d 273 (citing *Messina,* 212 Md. at 606, 130 A.2d 578).

Considering the issue of whether an indecent exposure may occur in a private residence, the Court of Appeals concluded as follows:

We are persuaded by the logic of the majority of the courts in our sister states that an indecent exposure within a private dwelling may suffice. As explored in *Messina,* the issue is primarily one of whether the defendant's behavior was done in secret or in a place observed or capable of being observed: "[t]he place where the offense is committed is a public one if the exposure be such that it is likely to be

seen by a number of casual observers." *Id.* at 605, 130 A.2d at 579–80.

*Wisneski,* 398 Md. at 601, 921 A.2d 273.

The Court defined a "casual observer" in this context as "one who observes the defendant's acts unexpectedly." *Id.* This will depend on the circumstances of the case. *Id.* The Court summarized the law, *id.* at 602, 921 A.2d 273:

> Therefore, we believe that under a reasoned approach, and based upon our jurisprudence, as limited as it may be, the common law offense of indecent exposure requires wilfulness and observation by one or more casual observers who did not expect, plan or foresee the exposure and who were offended by it. This definition of "public" not only incorporates and reflects the historical antecedents from England for criminalizing the offense, as enunciated by Sir William Blackstone, to prohibit unexpected offensive conduct, but it also compliments the "public" nature of all of the elements of indecent exposure.

■ In the circumstances of the instant case, appellant's conduct amounted to a public display of indecent exposure. Although an inmate, appellant was temporarily housed in the medical unit in a room with a large glass window that oversaw the bed which was located right next to that window. Moreover, with the exception of an area located behind the shower curtain, this room was observable at times by, not only Corporal Goodridge, but other members of the staff and public, including nurses, maintenance staff, non-uniform staff, pastoral staff, counselors, tour groups, and, even other inmates.

While housed in that room, appellant exposed his penis and masturbated while he lay in the bed located next to the large glass window to that room. It was in that setting that Corporal Goodridge, who was accompanied by Nurse Tracy and another inmate, saw appellant masturbating and ordered him to stop on several occasions. Instead of complying with Goodridge's order, appellant instead smiled at her and then continued until he ejaculated. According to Sergeant Camp-

bell, Corporal Goodridge was "very upset," "angry," and "expressing disgust with what had happened. . . . "

Appellant agreed that the window into the room was "pretty big," and "pretty much has your entire bed on display." In addition, appellant knew that he was not the only person in the area, and that nurses entered the area on an irregular basis. This evidence was legally sufficient to sustain the charge of common law indecent exposure.

In sum, we hold that the enactment of C.S. § 8–803 did not preempt the field concerning cases of indecent exposure committed by inmates in the correctional system. The trial court correctly denied appellant's motions when it decided to submit both common law indecent exposure and the statutory offense of indecent exposure by an inmate in the presence of a correctional officer to the jury.

### 2. The Motion for New Trial

█ Appellant's remaining contention is that the trial court erred in denying his motion for a new trial in the absence of a hearing. The State responds that appellant's motion was a motion under Maryland Rule 4–331(a), and that whether to hold a hearing under that section is discretionary. We agree.

The jury returned its verdict on March 19, 2009. Appellant filed a motion for new trial on March 27, 2009, eight days after the verdict. As part of a Memorandum of Law in support of that motion, appellant averred that "Maryland Rule 4–331 provides every defendant the right to request a new trial within ten days of the verdict." After the State filed its response, the trial court denied the motion without a hearing on April 15, 2009. Sentencing was thereafter conducted on April 21, 2009.

Maryland Rule 4–331 provides, in relevant part:

(a) *Within ten days of verdict.* On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

✽ ✽ ✽

(e) *Disposition.* The court may hold a hearing on any motion filed under this Rule and shall hold a hearing on a motion filed under section (c) if the motion satisfies the requirements of section (d) and a hearing was requested. The court may revise a judgment or set aside a verdict prior to entry of a judgment only on the record in open court. The court shall state its reasons for setting aside a judgment or verdict and granting a new trial.

The rule is discretionary with respect to motions filed under subsection (a). Appellant cites *Jackson v. State,* 358 Md. 612, 625, 751 A.2d 473 (2000), in support of his contention that a hearing was required on his motion. *Jackson* is inapposite because that case involved a claim as to whether the trial court erred in denying petitioner's motion for new trial, based on newly discovered evidence *under Maryland Rule 4–331(c),* without conducting a hearing. *Jackson,* 358 Md. at 614, 618–19, 751 A.2d 473.

Moreover, we note that the basis of appellant's motion was an allegation that one juror changed her vote during deliberations because she "felt threatened" by another juror. As this Court has explained: "[t]he law in Maryland is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake." *Eades v. State,* 75 Md.App. 411, 416, 541 A.2d 1001 (quoting *Williams v. State,* 204 Md. 55, 67, 102 A.2d 714 (1954)), *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988); *accord Dorsey v. State,* 185 Md.App. 82, 102, 968 A.2d 654 (2009). Accordingly, the trial court properly exercised its discretion in denying appellant's motion under Rule 4–331(a) without conducting a hearing.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**